IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

ERSALENE STEVENSON                                                          PLAINTIFF
O/B/O T. J. G.

VS.                                     CIVIL NO. 06-1010

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                                 DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Ersalene Stevenson, brings this action on behalf of her minor niece, T. J. G.,

seeking judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the

Social Security Administration (Commissioner) denying T. J. G.'s application for child's

supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

## I. Background:

Plaintiff protectively filed an application for SSI on T. J. G.'s behalf on November 14, 2003,

alleging that T. J. G. is disabled due to nervousness and forgetfulness, attention deficit hyperactivity

disorder, and borderline intellectual functioning.[1] (Tr. 45-48, 70, 74). An administrative hearing

was held on June 14, 2005. (Tr. 199-225). Plaintiff and T. J. G. were present and represented by

council. At that time, T. J. G. was twelve years old and had completed the sixth grade. (Tr. 342).

---

[1]SSI benefits are not payable for the period prior to the application; therefore, the relevant
time period runs from the date of the application. *See Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th
Cir. 1989); 20 C.F.R. §§ 416.330, 416.335. Consequently, the relevant period is from November
14, 2003, Plaintiff's protective filing date for SSI, through September 23, 2005, the date of the
Commissioner's final decision denying disability. (Tr. 19, 45). Evidence concerning ailments
outside the relevant time period can support or elucidate the severity of a condition; however,
such evidence cannot serve as the only support for disability. *See Pyland v. Apfel*, 149 F.3d 873,
877 (8th Cir. 1998).

The Administrative Law Judge ("ALJ"), in a written decision dated September 23, 2005, found that T. J. G.'s impairments, but did not meet, medically equal, or functionally equal any listed impairment. (Tr. 18-19).

On December 8, 2005, the Appeals Council declined to review this decision. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs and the case is now ready for decision. (Docs. # 13, 14).

## II. Applicable Law:

The court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(c)(i); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment

if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked", and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3).

## II.    Discussion:

In the present case, the ALJ concluded that T. J. G. had less than marked limitations in the area of acquiring and using information and no limitations in the area of attending and completing

4

tasks. However, after a thorough review of the evidence of record, we do not find substantial evidence to support these findings. The pertinent medical evidence reveals as follows.

On April 24, 2002, plaintiff underwent a psychological evaluation with Amy Anderson, a licensed psychological examiner. (Tr. 102-108). Testing revealed a full scale IQ of seventy-seven, placing her in the sixth percentile of children tested her age. (Tr. 103). Ms. Anderson noted that this was indicative of a below average range of intellectual ability. A comparison of her verbal and performance scores revealed that she performed equally as well on tasks requiring verbal ability as nonverbal ability. On the verbal comprehension factor, which measures a person's ability to apply verbal skills and information to the solution of new problems and process verbal information, T. J. G. scored within the low range of ability. She also scored within the low range of functioning on the perceptual organization factor test, which measured her ability to think and solve problems in nonverbal, abstract, and conceptual terms. This test also measured her ability to manipulate objects as well as perceive relationships between them. Further, the freedom from distractibility factor indicated a low average ability on tasks involving short term memory, sustained attention, and concentration. Additional testing revealed weaknesses in computational skills and ability to analyze and solve practical problems in mathematics; comprehend both single words and sentences; and, produce simple and complex sentences free from the penalty for errors in spelling, punctuation, and capitalization. Ms. Anderson noted that there were discrepancies in the areas of basic reading, reading comprehension, math calculation skills, and written expression when using T. J. G.'s non-verbal IQ. (Tr. 107). She indicated that the severe discrepancies seen in this case generally indicated the presence of learning disabilities. (Tr. 107).

On August 5, 2003, progress notes from Cheryl Oswalt, a licensed social worker, indicate that T. J. G. had been diagnosed with ADHD and adjustment disorder. (Tr. 113). Although Ms. Oswalt's records show that T. J. G. was not taking any medication, medication management records dated January 15, 2003, show that she had been prescribed Ritalin LA and Trazodone. (Tr. 118). Further, records from October 2003 reveal that T. J. G. was still taking Ritalin. (Tr. 132).

Records dated October 2003 indicate that T. J. G. was suspended from school due to insubordination. (Tr. 65). Attendance records show that she was suspended from October 21, 2003, until October 28, 2003. (Tr. 64).

On December 11, 2003, treatment notes from Dr. Jerry Grant show that T. J. G. experienced a poor response to Ritalin. (Tr. 130). As such, he prescribed Strattera and referred her to South Arkansas Regional Health Center. (Tr. 130).

On March 1, 2004, Dr. Grant noted that T. J. G. was "much improved" after an increase in her dosage of Strattera. (Tr. 127). However, on March 30, 2004, Karla Long, T. J. G.'s social studies teacher, completed a school questionnaire. (Tr. 61-63). She indicated that T. J. G. had problems making/keeping friends and socializing with trouble-makers. Ms. Long also noted problems with concentration that noticeably interfered with T. J. G.'s academic progress. Further, she reported behavioral problems including talking out of turn, responding poorly to change, lying/stealing, problems handling personal needs, difficulty learning from mistakes, defiance/disobedience, and problems with self-confidence. With the exception of T. J. G.'s problem with talking out of turn, which was rated as a serious detriment, the remaining problems were noted to noticeably interfere with T. J. G.'s academic progress. (Tr. 62).

On June 15, 2004, T. J. G. underwent an intellectual assessment and evaluation of adaptive functioning with Kenneth B. Robinson, a licensed psychological examiner, and Dr. Charles M. Spellmann. (Tr. 133-136). Plaintiff reported that T. J. G. was enrolled in special education math, science, and reading courses. (Tr. 133). Intellectual testing again revealed an IQ of seventy-six, which fell within the borderline range of intelligence. (Tr. 134). Further, results on the WRAT-III indicated that her academic achievement "across the board" was "well below grade level," placing her in the "slow learner" range of academic potential. (Tr. 134, 136). Although her concentration was noted to be adequate, the examiner stated that she did need some encouragement in staying on task when confronted with difficulty. (Tr. 134). In addition, her pace was said to be mixed, but generally below average. As such, the examiner found deficits in the areas of home-living and leisure.

Ms. Stevenson reported to the examiner that T. J. G. had been in trouble at school for fighting, cursing a bus driver, and arguing with others. (Tr. 135). She indicated that T. J. G.'s behavior had improved with medication but stated that T. J. G. still got "angry very quickly." The examiners noted no evidence of unusual passivity, dependency, aggression, impulsiveness, or withdrawal. Further, he concluded that T. J. G. possessed age-appropriate self-help skills. Although the examiners found that T. J. G. was capable of understanding and retaining instructions to perform simple, repetitive tasks, they concluded that she was "not very effective in her approach." (Tr. 136).

On September 7, 2004, Judy Bailey, T. J. G.'s math teacher, completed a school questionnaire. (Tr. 55-57). She indicated that plaintiff had problems with concentration that noticeably interfered with her academic progress. (Tr. 55). However, Ms. Bailey noted no deficiencies in the areas of working independently or staying on task, concentrating on things of

interest to the student, or completing assignments on time. She then made the following statement: "I don't see any significant problems. She just works more slowly than some." Ms. Bailey admitted that it was "early in the school year" but stated that T. J. G. had trouble getting organized to complete her work. (Tr. 57).

On September 23, 2004, Michael Dodd, a licensed psychological examiner at SARHC, wrote a letter documenting his prior treatment of T. J. G. (Tr. 138-140). He noted that T. J. G. functioned within the lower limits of the borderline rage of intellectual functioning. (Tr. 139). Further, Mr. Dodd indicated that her achievement abilities were below, and even potentially well below, that expected for a youngster who functions within the borderline range. Although T. J. G. was working diligently in treatment, Mr. Dodd opined that she was "doomed for deficits and difficulties secondary to her functioning level, subsequent difficulty with insight and intuition, and also secondary to trauma that she has been through in the past." (Tr. 139). His letter reveals that T. J. G. was receiving specialized services due to her learning abilities and below average achievement abilities. (Tr. 139).

Mr. Dodd indicated that T. J. G's attentional problems were not "classic" in terms of her ADHD. (Tr. 139). He noted that she had a history of trauma, including physical and sexual abuse that had previously caused remarkable depression, suicidal ideation, and psychosis. (Tr. 139-140). Mr. Dodd also stated that T. J. G.'s mother was a substance abuser and had subjected T. J. G. to her abuse of "severe drugs including crack." He believed that this history was responsible for some of T. J. G.'s attentional problems. Mr. Dodd also mentioned the possibility that T. J. G. could inherit some of her mother's "pathology." (Tr. 139).

A grade report for the 2004 school year revealed that T. J. G. earned three F's the first semester (English, math, and science) and two D's (social studies and reading). (Tr. 58). The second semester, she earned four C's (English, science, social studies and reading) and a D (math). Likewise, during the 2005 school year, T. J. G. earned one A (music/piano) two B's (social studies and math), three D's (science, math, and reading), and an F (English) for the first semester and one A (music/piano), one C (math), four D's (social studies, science, reading, and math) and an F (English) the second semester. (Tr. 98).

This evidence makes clear that T. J. G. suffered from borderline intellectual functioning, learning disabilities, and ADHD, all of which interfered with her ability to learn, retain, and concentrate on her academics. Reports from teachers and psychological examiners alike reveal that T. J. G.'s academic potential was well below that of the average child her age. Further, these reports document problems with both concentration and behavior that resulted from the combination of her impairments. As this was not properly taken into account by the ALJ, we believe that remand is necessary to allow him to reevaluate T. J. G.'s developmental capacity in the six specified domains of functioning.

We also note that the record does not contain a childhood disability assessment prepared by any of T. J. G.'s treating physicians. *See Vaughn v. Heckler*, 741 F.2d 177, 179 (8th Cir. 1984) (If a treating physician has not issued an opinion which can be adequately related to the disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record). Therefore, on remand, the ALJ is directed to address interrogatories to the physicians who have evaluated and/or treated T. J. G., asking the physicians to review her medical records; to complete a mental and physical RFC assessment regarding plaintiff's capabilities during the time

period in question; and, to give the objective basis for their opinions, so that an informed decision can be made regarding T. J. G.'s RFC during the relevant time period in question. *Chitwood v. Bowen*, 788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

**III.  Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence, and therefore, the denial of benefits to T. J. G., should be reversed and this matter should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this the 29th day of September 2006.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE